2022 IL App (1st) 220398-U

FIRST DISTRICT,
FIRST DIVISION
August 22, 2022

No. 1-22-0398

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN RE: A.M., a minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | No. 21 JA 141 |
| v. | ) | |
| | ) | |
| B.M., | ) | Honorable |
| | ) | Sybil Thomas, |
| | ) | Judge Presiding. |
| Respondent-Appellant.) | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's adjudication finding minor neglected on a theory of anticipatory neglect was not against the manifest weight of the evidence where mother medically neglected another child and was noncompliant with reunification services.

¶ 2     The State filed a petition for adjudication of wardship alleging A.M. was a neglected and abused minor. The trial court found A.M. was abused and neglected due to an injurious

environment and adjudged A.M. a ward of the court. B.M. now appeals.[1] For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        A.M. was born on March 10, 2021. On March 17, 2021, the State filed a petition for adjudication of wardship over her, alleging neglect based on an environment injurious to her welfare and abuse based on a substantial risk of physical injury with a factual basis as follows:

> "Mother has one prior indicated report for medical neglect. Mother has one minor not [in] her care and one other minor who is in DCFS custody with findings having been entered. Mother is non-compliant with offered and recommended reunification services. Mother has cognitive delays. Putative father's whereabouts are unknown and paternity has not been established."

¶ 5        At A.M.'s adjudication hearing on February 28, 2022, the State introduced an adjudicatory order for A.M.'s older sibling J.A. entered on May 22, 2019, reflecting that J.A. was "abused or neglected" because his "parents did not complete necessary medical training." Gail Hibbler, B.M's caseworker from 2018 to 2021, testified that she was assigned to B.M.'s case because J.A. was in DCFS custody due to medical neglect. J.A. had short bowel syndrome requiring specialized care. B.M. was asked to attend J.A.'s doctor's appointments to learn how to care for his condition, but she failed to comply.

¶ 6        Individual therapy and parenting classes were recommended and offered to B.M. to safely reunify with J.A., but she was unable to complete either service. Her therapist found that "[t]hey were unable to move forward because of his concern for her cognitive ability" and B.M. "would not necessarily benefit from therapy." As for the parenting classes, B.M. was placed in a

---

[1] A.M.'s putative father was defaulted and is not involved in this appeal.

class but did not participate. Hibbler had difficulty maintaining contact with B.M. At times, B.M. failed to return calls and missed visits. Although B.M. initially lived with her mother, she later informed Hibbler that she was "going to be homeless." Hibbler attempted to assist her in finding housing, and she lived in a shelter "for a while."

¶ 7        As of March 2021, B.M. had not completed the services recommended to reunify with J.A. After A.M. was born, Hibbler visited B.M. at her mother's house. During the visit, Hibbler believed that B.M. was residing there, "so it appeared she had shelter and someone additional was going to be assisting with the child." But after the visit, "she gave a different address about where she was living." Hibbler observed no signs that A.M. was being abused or neglected and had no immediate concerns for her safety. The home was free of debris and obvious hazards. Hibbler called a DCP investigator about A.M. as "standard procedure" because B.M. already had a child in DCFS custody.

¶ 8        When asked whether she had concerns about B.M.'s ability to take care of A.M., Hibbler said she might need "assistance for *** some day-to-day things" because when she was homeless, she "struggle[d] advocating for herself" and "get[ting] some things accomplished." Based on B.M.'s difficulty in scheduling and attending visitation appointments, Hibbler was concerned that B.M. would have difficulty scheduling and attending doctor's appointments for A.M. without support. She also believed B.M.'s cognitive delay might impact her judgment and ability to perform "some tasks."

¶ 9        B.M. introduced no evidence at the hearing. The court found that A.M. was abused and neglected due to an injurious environment. Based on Hibbler's testimony, the court was "concerned" about B.M.'s "abilities and her abilities to have support."

¶ 10    The case proceeded to a dispositional hearing at which caseworker Sarah Matthews testified that she was assigned to A.M.'s case on September 1, 2021. In May 2021, A.M. was placed in a non-relative foster home with her brother J.A. Developmental screening of A.M. did not show any developmental delays or special needs. B.M. was allowed weekly supervised visits with A.M. and J.A. but visited only twice a month for "a mixed bag of reasons." During the visits, B.M. acted appropriately with A.M., and Matthews had no safety concerns "with someone there. *** [S]he responds to people assisting her, but she does appear to need someone to somewhat show her at times how to proceed."

¶ 11    B.M. told Matthews that she was residing with her mother. Her records indicated that she "has a payee and is receiving Social Security *** because of a developmental delay." Regarding reunification services, B.M. was referred for parenting classes in June 2021 and was unsuccessfully discharged due to nonattendance. Matthews re-referred her in January 2022 and she was on a waitlist to attend. B.M. was also referred for therapy but only received "like a one-day session" because her therapist "found her not to be appropriate due to her developmental delays." She was scheduled to undergo a psychological and parenting capacity assessment on March 24, 2022 so that a psychologist could determine "how we could best address her needs due to her delay." Matthews also directed B.M. to submit to urine screens twice a month. Her first screen tested positive for THC, her second was an excused absence because Matthews sent her to the wrong location, and B.M. missed the remaining 12 screens.

¶ 12    The court found that B.M. was unable to care for, protect, train, or discipline A.M. "at this time" and, despite reasonable efforts, the removal of A.M. from her home could not be prevented. The court specifically held that "appropriate services aimed at family preservation are

unsuccessful at this time, but are ongoing." A.M. was adjudged a ward of the court with a permanency goal of "return home within 12 months."

¶ 13                                              ANALYSIS

¶ 14        The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2020)) sets forth a two-step process to determine whether a minor should be removed from her parents' custody and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. At the adjudication hearing, the court determines whether the minor is abused or neglected (705 ILCS 405/2-18(1) (West 2020)). If a finding of abuse or neglect is entered, a dispositional hearing is held to determine whether the minor is made a ward of the court. 705 ILCS 405/2-21(2) (West 2020).

¶ 15        B.M. argues that the State failed to introduce sufficient evidence at the adjudication hearing to prove that A.M. was neglected due to an injurious environment.[2] "Neglect" is the failure to exercise the care that circumstances justly demand, either intentionally or unintentionally. *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006). An injurious environment is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children." (Internal quotation marks omitted.) *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28. We will not reverse the trial court's finding of neglect unless it is against the manifest weight of the evidence (*In re Edward T.*, 343 Ill. App. 3d 778, 798 (2003)), keeping in mind that "the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence." *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006).

---

[2] B.M. does not challenge the court's dispositional ruling finding her unable to care for A.M. and has waived any challenge thereto. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see *In re R.S.*, 382 Ill. App. 3d 453, 464 (2008).

¶ 16        In this case, the court applied a theory of anticipatory neglect, under which "the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside *** with an individual who has been found to have neglected or abused other children." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). A previous finding of neglect against one child is not conclusive of neglect against another child, but is admissible and should be considered alongside all other relevant facts. *Id.* at 468-69; see, *e.g.*, *In re Kenneth D.*, 364 Ill. App. 3d 797, 802 (2006); *In re Erin A.*, 2012 IL App (1st) 120050, ¶¶ 31-35. The State bears the burden of proving abuse or neglect by a preponderance of the evidence. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23.

¶ 17        The State presented sufficient evidence to satisfy its burden to show that that B.M. was unable to provide a " ' "safe and nurturing shelter" ' " for A.M. *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000) (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995))). During Hibbler's three years as B.M.'s caseworker, she observed that B.M. had difficulty in scheduling and attending appointments. B.M. failed to receive the medical training necessary to care for J.A.'s special needs and missed a number of visits with J.A., she did not return Hibbler's calls, and she did not attend parenting classes in which she was enrolled. Hibbler testified that B.M. "struggles advocating for herself *** [and] trying to get some things accomplished." Although she was able to "manage" taking care of herself on a day-to-day basis, Hibbler was concerned about her ability to properly care for a child.

¶ 18        B.M. argues that A.M. is not "similarly situated" to J.A. because, unlike her brother, she does not have a condition requiring specialized care. There is no requirement that children be "similarly situated" for the theory of anticipatory neglect to apply. See *Erin A.*, 2012 IL App (1st) 120050, ¶¶ 31-35. In *Erin A.*, Erin was found medically neglected because her parents

refused to have her undergo recommended blood screening for sickle cell disease. *Id.* ¶ 2. Her sibling Alicia was not similarly at risk for sickle cell disease but was found a victim of anticipatory neglect. We affirmed, since "a child who does not receive appropriate medical evaluations or care is neglected" (*id.* ¶ 7) and the parents' failure to provide adequate medical care for Erin was probative of an injurious environment for Alicia. *Id.* ¶ 35.

¶ 19        Likewise, we find B.M.'s medical neglect of J.A. to be probative of an injurious environment for A.M. Although B.M. was afforded the opportunity to receive the medical training necessary to care for J.A., she inexplicably failed to do so for three years. Her caseworker was concerned that she would have difficulty scheduling and keeping appointments for A.M.'s medical needs based on her difficulty in addressing J.A.'s medical needs and her failure to complete the recommended unification services. Based on this evidence, the trial court reasonably found it was more likely than not that A.M. would be subject to medical neglect in B.M.'s care despite not sharing her brother's condition.

¶ 20        *In re Edricka C.*, 276 Ill. App. 3d 18 (1995), is inapposite. Edricka and Zemaj were born in 1991 and 1992 and lived with respondent without incident until their cases were brought into court in December 1992. The State initially made allegations of medical neglect regarding Edricka. When those were found to be baseless, the State did not dismiss its petition but "seem[ed] to advocate a *per se* rule of anticipatory neglect" (*id.* at 28) because an older sibling was beaten by respondent in 1987 and several others were left home unsupervised in 1989. After the 1989 incident, respondent completed counseling services and began parenting classes, and the family's DCFS caseworker did not believe Edricka and Zemaj were at risk in respondent's care. *Id.* at 29-30. Under the particular facts of that case, we found the trial court's finding of neglect against the manifest weight of the evidence. *Id.* at 30.

¶ 21        By contrast, B.M. was noncompliant with reunification services for J.A., indicating that she had not addressed the underlying issues leading to J.A.'s 2019 adjudication of abuse and neglect. Accordingly, Hibbard was justifiably concerned about B.M.'s judgment and her ability to properly care for another child without support.

¶ 22        Lastly, B.M. contends that the court improperly relied on Hibbler's lay opinion that B.M.'s cognitive delay impaired her judgment and her ability to perform "some" tasks. See *People v. Wright*, 111 Ill. 2d 128, 148 (1985) (lay opinions on mental condition are admissible only if based on personally observed facts stated in detail). Hibbler's testimony regarding B.M.'s "delay" was not the basis for the trial court's decision. Rather, the court entered its finding of neglect based on Hibbard's "concerns" about B.M.'s "abilities and her abilities to have support," which were supported by the record. We find that the State submitted sufficient evidence to satisfy its burden to show that A.M. is a neglected minor based on an injurious environment.

¶ 23                                    CONCLUSION

¶ 24        For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 25        Affirmed.